[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 12-16396, 12-16397
_____

D.C. Docket Nos. 9:10-cv-80840-KLR,
9:10-cv-80883-KLR


JOSEPH ADINOLFE, et al.,

Plaintiffs-Appellants,

versus

UNITED TECHNOLOGIES CORPORATION,
d.b.a. Pratt & Whitney,

Defendant-Appellee.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(October 6, 2014)

Before PRYOR and JORDAN, Circuit Judges, and FRIEDMAN, [*] District Judge.

JORDAN, Circuit Judge:

---

[*] Honorable Paul L. Friedman, United States District Judge for the District of Columbia, sitting by designation.

These consolidated appeals concern the dismissal with prejudice, under Federal Rule of Civil Procedure Rule 12(b)(6), of the second amended complaints filed in two related toxic tort cases asserting common-law and statutory claims under Florida law.  Given the posture of these appeals, one would have expected the parties' briefs to focus exclusively on whether the allegations in the complaints stated claims for relief under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and its progeny.  The briefs, however, go well beyond what is alleged in the complaints, and in part rely on and clash over the expert testimony and evidence presented by the parties pursuant to the district court's *Lone Pine* scheduling order.  *See, e.g.,* Br. for Appellants at 13-18, 20-24, 25-27, 42-44, 45; Br. for Appellee at 2-11, 12-14, 21-22, 29-33, 35, 39-41.[1]

Given the analytical difficulties caused by the parties' schizophrenic presentations on appeal, we begin by explaining why a *Lone Pine* order like the one entered in this case should not be used as a pre-discovery case management tool before a district court rules on the legal sufficiency of a complaint.  Turning to the merits of the district court's dismissal orders, we reverse.

**I**

---

[1] This type of order, which originated in *Lore v. Lone Pine Corp.,* No. L-33606-85, 1986 WL 637507, at *1-2 (N.J. Sup. Ct. Law Div. Nov. 18, 1986), requires plaintiffs in mass tort cases to provide *prima facie* factual support for their claims or risk dismissal.

In two consolidated toxic tort cases (*Pinares* and *Adinolfe*), hundreds of property owners in a residential area in Palm Beach County known as "The Acreage" sued United Technologies Corporation d.b.a. Pratt & Whitney, an aircraft and rocket engine manufacturer, for damages resulting from purported groundwater contamination. In their complaints, the plaintiffs alleged that P&W discharged various toxic chemicals into the soil and groundwater at a plant located some six miles north of The Acreage. The plaintiffs claimed that these chemicals migrated to The Acreage via the southward-flowing aquifer underlying both the P&W plant and The Acreage, that one plaintiff developed cancer as a result of the contamination, and that the property values of the other plaintiffs in The Acreage declined as a result of the perceived health risks of the contamination.

The plaintiffs initially asserted Florida common-law claims sounding in negligence, negligence per se, strict liability, trespass, and nuisance, as well as a statutory claim under Fla. Stat. § 376.313. In *Pinares,* the plaintiff (who alleged that she had developed cancer as a result of the contamination) and her husband sought damages for personal injury and loss of consortium, while in *Adinolfe* the plaintiffs generally claimed damages for diminution in the value of their property.

In January of 2011, the district court dismissed the initial complaints in *Pinares* and *Adinolfe* without prejudice.  It ruled, in relevant part, that the plaintiffs had not alleged that their properties were actually contaminated, had not identified

3

the alleged contaminant, and had not sufficiently alleged that any harm (to person or property) was caused by P&W.  *See, e.g., Adinolfe v. United Technologies Corp.,* No. 10-80840, 2011 WL 240470 (S.D. Fla. Jan. 18, 2011). The plaintiffs then filed amended complaints in both cases.

## A

After it moved to dismiss the initial complaints, P&W asked the district court to enter a *Lone Pine* case management order in the two cases.  The plaintiffs objected, arguing in part that they should not be required to submit *prima facie* proof of their claims before discovery, that the requested order served as an improper substitute for summary judgment, and that the Federal Rules of Civil Procedure counseled against granting P&W's request.  At around the same time that it granted the motions to dismiss the initial complaints, the district court granted the motions for the *Lone Pine* case management orders.  The district court explained that it was "neither efficient nor fair" to require P&W to "proceed on the issues implicated" by the plaintiffs' requested discovery until after the plaintiffs "ha[d] adequately demonstrated a *prima facie* basis for the allegations in their complaint." *Pinares v. United Techonologies Corp.,* No. 10-80883, 2011 WL 240512, at *2 (S.D. Fla. Jan. 10, 2011).

In its subsequent *Lone Pine* orders, the district court stayed all discovery and required the plaintiffs to provide, within 60 days, "all evidence they contend

supports the *prima facie* elements of contamination and causation" for the property damages claims. Such evidence included, but was not limited to, disclosure of any testing for contaminants conducted on each plaintiff's property, and disclosure of any contaminants found on each plaintiff's property (as well as information about when they were found).

The *Lone Pine* orders also required the plaintiffs to submit "sworn statements of an expert or experts" with opinions (and the factual bases for any opinions) on a number of factual issues: (i) whether particular parcels owned by the plaintiffs contained hazardous contaminants; (ii) whether particular parcels owned by the plaintiffs were contaminated; (iii) whether P&W caused contamination on a particular parcel owned by a plaintiff or plaintiffs; (iv) what materials or substances allegedly caused the contamination to each plaintiff's parcel, including the toxicological, medical, or other basis for the allegation that the presence of the alleged contaminant poses a risk to human health or otherwise causes each plaintiff to suffer damage; and (v) the value of each plaintiff's property after the claimed date of contamination. The orders further provided that P&W could, within 60 days of receiving the plaintiffs' evidence, "file a motion directed to whether [the plaintiffs] complied with this order."

**B**

Predictably, P&W did not think that the plaintiffs provided the information required by the district court's *Lone Pine* orders, so it filed motions to dismiss for failure to comply with those orders.  In its motions, P&W did not simply address the plaintiffs' alleged failure to comply with the *Lone Pine* orders; it also challenged the opinions of the plaintiffs' experts, arguing in part that the experts failed to show that water traveled from P&W to The Acreage or that the water at The Acreage was below national and state drinking water standards. In support of its motions to dismiss, P&W submitted and relied on two expert affidavits of its own (one from a toxicologist and the other from a hydrologist) "to set out the regulatory standards, where appropriate, and to provide information that [the plaintiffs'] experts did not include."

Just as predictably, the plaintiffs argued in their responses that they had complied with the *Lone Pine* orders, that the orders did not require the testing of groundwater under each plaintiff's property, and that the orders did not prevent their experts from using extrapolative techniques to form their opinions.  They pointed out that drilling a test well on each of the 17,000 parcels of property in The Acreage, combined with the concomitant laboratory analysis of each sample of groundwater, would cost about $382 million.  The plaintiffs also argued that P&W could not attempt to litigate factual issues such as contamination and causation by submitting its own expert affidavits:

6

"By attempting to turn its [m]otion to [d]ismiss into a dispositive motion on the merits, or a *Daubert* hearing, P&W is unfairly exploiting and further abusing the already oppressive (and in this case inappropriate) *Lone Pine* process.  If P&W's [m]otion to [d]ismiss is to be resolved based on the affidavits of the parties' experts, [the] [p]laintiffs' due process rights are violated as they would be deprived of the benefits and protections afforded by mutual discovery under Rules 26 through 37, formal notice, a formal summary judgment motion under Rule 56, and an evidentiary hearing under *Daubert."*

Nevertheless, the plaintiffs hedged their bets by submitting supplemental declarations from some of their own experts to counter the affidavits of P&W's experts.

In reply, P&W argued that, "[b]efore proceeding with this alleged toxic tort case, [the] [p]laintiffs must show that their properties are contaminated and that [P&W] caused the contamination."  P&W also asserted that the opinions of the plaintiffs' experts were shown to be deficient by the analyses and reports of P&W's own experts, that a showing of actual contamination was required by Florida law, and that it was not seeking a battle of the experts at the *Lone Pine* stage of the case, but merely submitting "expert affidavits to provide information that [the] [p]laintiffs simply did not provide—for example, the results of [state]

testing dozens of Acreage wells and finding clean, uncontaminated water in the middle of . . . alleged plumes [identified by one of the plaintiffs' experts]." Yet, in apparent contradiction to this statement, P&W went on to argue, relying on its own expert witnesses, that the level of trihalomethanes (a type of contaminant) in the water in The Acreage was "well within safe water drinking standards," and that the water from P&W, contrary to the plaintiffs' allegation, "flows east then north to the C18 canal, then north into the Loxahatchee River away from [T]he Acreage."[2]

## C

At a hearing on P&W's motions to dismiss the plaintiffs' amended complaints, the district court told the parties several times that it did not want to discuss the expert testimony and evidence contained in the *Lone Pine* filings, and was just going to determine whether the complaints stated claims for relief under cases like *Twombly*. Nevertheless, during the hearing, the district court and the parties frequently strayed beyond the four corners of the complaints and discussed the expert testimony and factual submissions contained in the *Lone Pine* filings.

In March of 2012, following the hearing, the district court entered orders dismissing the amended complaints in *Pinares* and *Adinolfe* without prejudice. The plaintiffs then filed second amended complaints in both cases, asserting common-

---

[2] P&W submitted a response to the plaintiffs' court-ordered filing of record cites showing compliance with the *Lone Pine* orders, in which it argued a number of factual issues (failure to test each parcel of property, failure to show actual contamination, failure to consider publicly available testing data, and failure to demonstrate water flow from P&W to The Acreage).

8

law claims for strict liability, negligence, and nuisance, as well as a statutory claim under Fla. Stat. § 376.313(3). The second amended complaint in *Pinares* contained an additional claim for loss of consortium, while the second amended complaint in *Adinolfe* divided the plaintiffs into three proposed groups based on whether their property was currently contaminated (the "contamination" plaintiffs), close to the contaminated area (the "proximity" plaintiffs), or soon-to-be contaminated (the "anticipated contamination" plaintiffs).

The district court later dismissed the second amended complaints, this time with prejudice. The plaintiffs now appeal. Before addressing the sufficiency of the complaints, we discuss the district court's *Lone Pine* orders.

## II

District courts have "broad discretion in deciding how best to manage the cases before them," *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1366 (11th Cir. 1997) (quotation omitted), and Rule 16(c)(2)(L) of the Federal Rules of Civil Procedure allows district courts to "adopt[ ] special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems." *Lone Pine* orders, in the words of the Fifth Circuit, are "designed to handle the complex issues and potential burdens of defendants and courts in mass tort litigation." *Acuna v. Brown & Root, Inc.,* 200 F.3d 335, 340 (5th Cir. 2000). They usually require plaintiffs in

9

mass tort cases to provide some factual support, including expert testimony, for their claims or run the risk of having those claims dismissed. *See Lone Pine*, 1986 WL 637507, at \*3-4; David Herr, Annotated Manual for Complex Litigation Fourth § 11.34, at 49 (Westlaw database updated May 2014).[3]

A couple of our sister circuits have spoken favorably about *Lone Pine* orders. *See Acuna,* 200 F.3d at 338-40; *Abuen v. Gen. Elec. Co.,* 3 F.3d 329, 331 (9th Cir. 1993). But there is a time and place for everything, *cf*. NEW AMERICAN BIBLE, THE BOOK OF ECCLESIASTES 3:1 (Oxford 1990), and "even when appropriate," *Lone Pine* orders "may not be suitable at every stage of the litigation." *In re Vioxx Prod. Liab. Litig.*, 557 F. Supp. 2d 741, 744 (E.D. La. 2008) (using *Lone Pine* order after case had been pending for three years and "much discovery ha[d] taken place").

As a general matter, we do not think that it is legally appropriate (or for that matter wise) for a district court to issue a *Lone Pine* order requiring factual support for the plaintiffs' claims before it has determined that those claims survive a

---

[3] For different perspectives on the validity and efficacy of *Lone Pine* orders, see John T. Burnett, *Lone Pine Orders: A Wolf in Sheep's Clothing for Environmental and Toxic Tort Litigation*, 14 J. LAND USE & ENVTL. L. 53, 87 (1998) (arguing *Lone Pine* orders "diminish the legitimacy of the legal process by adding uncertainty and inconsistency to an otherwise regimented system" and "negate the checks and balances and safeguards that are inherent in properly promulgated rules of procedure"), and James P. Muehlberger & Boyd S. Hoekel, *An Overview of Lone Pine Orders in Toxic Tort Litigation*, 71 DEF. COUNS. J. 366, 367-68 (2004) (asserting that *Lone Pine* orders allow courts "to manage an unwieldy discovery docket" and to "eliminate frivolous claims quickly" by "requiring plaintiffs to produce prima facie evidence supporting their causes of action").

motion to dismiss under *Twombly*.  It is one thing to demand that plaintiffs come forward with some evidence supporting certain basic elements of their claims as a way of organizing (and maybe bifurcating) the discovery process once a case is at issue, and dealing with discrete issues or claims by way of partial summary judgment motions.  It is quite another to begin compiling, analyzing, and addressing evidence (pro and con) concerning the plaintiffs' allegations without reciprocal discovery before those allegations have been determined to be legally sufficient under Rule 12(b)(6).

Here, for example, despite the district court's best efforts, everyone at the motion to dismiss hearing repeatedly intermingled legal arguments going to the sufficiency of the second amended complaints with factual arguments derived from the expert testimony and other evidence produced pursuant to the *Lone Pine* orders.  Indeed, P&W went so far as to tell the district court that these factual matters could and should be considered in ruling on its pending Rule 12(b)(6) motions.  The district court, despite its own protestations, referred to evidence produced by the parties at numerous points during the hearing—at one time remarking that, according to the tests conducted at that time, the plaintiffs' wells were "clean"—possibly leading one to wonder whether any of its subsequent Rule 12(b)(6) rulings were affected or influenced by the opposing evidentiary presentations. *See generally Tal v. Hogan*, 453 F.3d 1244, 1252 (10th Cir. 2006)

11

("The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted.") (citation and internal quotation marks omitted). And, as already noted, on appeal the parties have continued their improper focus on evidence outside the four corners of the second amended complaints in addressing the legal sufficiency of those complaints.

Whatever the general propriety and/or utility of *Lone Pine* orders—matters we do not pass on today—they should not be used as (or become) the platforms for pseudo-summary judgment motions at a time when the case is not at issue and the parties have not engaged in reciprocal discovery. After all, "if [a district court] considers materials outside of the complaint, [it] must [generally] convert [a] motion to dismiss into a summary judgment motion." *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010). Critically, such a conversion requires notice to the parties and an opportunity for mutual discovery. *See Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002). And if these procedural safeguards are not enforced, then *Lone Pine* orders might become the practical equivalent of a heightened, court-imposed quasi-pleading standard, something the Supreme Court has frowned on. *See Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166-68 (1993)

12

(rejecting a "more stringent" and court-devised pleading standard intended to weed out non-meritorious municipal liability claims under 42 U.S.C. § 1983 and shield municipalities from "expensive and time-consuming discovery").

We understand the district court's concern that, without a *Lone Pine* order, a defendant in a case like this one would have to engage in expensive and time-consuming discovery without the plaintiffs first demonstrating some factual support for their claims.   That concern may be a valid one, but it cannot be allayed by use of a scheduling order that runs counter to the adversarial process envisioned by and detailed in the Federal Rules of Civil Procedure.   *See, e.g., Williams v. Georgia Dept. of Human Resources,* 789 F.2d 881, 882-83 (11th Cir. 1986) (reversing the grant of a pretrial "directed verdict" based on the submission of the evidence the parties would present at trial, because Rule 16 did not give the district court authority to direct a verdict at the pretrial stage of the case).

## III

We now turn to the district court's dismissal of the second amended complaints.  "We review *de novo* the district court's grant of a defendant's motion to dismiss under Rule 12(b)(6) for failure to state a claim, accepting the [factual] allegations in the complaint as true and construing them in the light most favorable to the plaintiffs." *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1303 (11th Cir. 2008) (citation omitted). In order to avoid dismissal, a complaint must allege "enough

facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

A

We first summarize the pertinent allegations of the second amended complaints in *Pinares* and *Adinolfe*, and then analyze the district court's reasons for dismissal. Unless otherwise noted, the allegations in the two complaints are the same.

The plaintiffs are residents and owners of real property in The Acreage. They contend that P&W has contaminated The Acreage.

P&W's industrial operations, which are located close to the northern edge of The Acreage, generate toxic wastes and chemicals, which are discharged or released into P&W's own surface water and groundwater. These wastes and chemicals are sometimes collected or buried at sites "from which they have, in part, leaked or escaped." In November of 2008, the Environmental Protection Agency found 24 contaminants in the soil and water on P&W's property. Testing conducted for P&W has confirmed that contaminants "are present in high concentration in the groundwater under and around its property."

Hydrologic studies have shown that P&W, the adjacent Corbett Wildlife Management Area, and The Acreage are "underlain by, and share the same . . . aquifer." Because groundwater in the contaminated aquifer flows from the north to

14

the south, the groundwater underlying The Acreage has been contaminated by the wastes and chemicals dumped, spilled, discharged, and released by P&W on its property and in the Corbett Wildlife Management Area. P&W has failed to take adequate steps to prevent the escape of contaminants from its property and has failed to warn residents to the south of this environmental problem.

Test wells drilled in The Acreage have revealed the presence of certain contaminants called trihalomethanes (specifically Bromodichloromethane, Methylene Chloride, and Chloroform) in the groundwater underlying The Acreage and the properties of the plaintiffs. These contaminants were spilled, discharged, released, or disposed of by P&W on its property and in the Corbett Wildlife Management Area, and experts (hydrologists and toxicologists) confirm that the contaminants "have travelled to and physically invaded The Acreage and are present in its groundwater." These chemicals, moreover, "will continue to move south through the aquifer and contaminate the shared water of The Acreage, which is dependent on groundwater and does not have municipal, city, or community water." Over 300 of the 384 individual plaintiffs in *Adinolfe* specifically alleged that their property in The Acreage "has been contaminated by P&W." The remaining plaintiffs in *Adinolfe* – the "proximity" and "anticipated contamination" plaintiffs – alleged one of two things: (1) that, although their property or groundwater has not yet been contaminated by P&W's wastes and chemicals, they

15

are harmed by the proximity of their land to those properties that are contaminated; or (2) that their property or groundwater, although not yet contaminated, "will, based upon a reasonable degree of hydrologic and geologic probability, be contaminated in the reasonably foreseeable future" by P&W's wastes and chemicals.

The *Pinares* plaintiffs tested their well water, which they have used for drinking, cooking, showering, and other activities of daily life since May of 2001. Those tests revealed that the water was contaminated with Bromodichloromethane, Methylene Chloride, and Chloroform. Significantly, these contaminants are genotoxic, which means that they do not require any specific concentration or amount of absorption individually or in combination for them to cause clear cell renal carcinoma, a certain type of cancer. One of the *Pinares* plaintiffs, Magaly Pinares, developed this type of cancer as a result of her ingestion and absorption of these contaminants.

In the late 1980s, the P&W property was evaluated for designation as a Top 10 Superfund site, but the EPA discontinued the evaluation at P&W's request because remediation efforts were underway. These efforts, however, did not eliminate the injurious concentration of contaminants in the groundwater that flowed from P&W's property to The Acreage. Nor did they include measures to halt the movement of contaminated groundwater that had ended up in The

16

Acreage. Indeed, a 1988 report from the Florida Department of Health stated that the P&W site remained a potential public concern because of the "risk to human health caused by the possibility of exposure to hazardous substances" via contaminants in groundwater and air.

In July of 2009, a television station in Palm Beach County reported that, according to a 2003 report of the Florida Fish and Wildlife Conservation Commission, metal drums marked "hazardous waste" were found dumped on the P&W side of the property line shared with the Corbett Wildlife Management Area. The report further indicated that a plume containing 1, 4-dioxane had spread from the drums.

In February of 2010, the Palm Beach County Health Department designated The Acreage as a "cancer cluster." Additional cases of children with cancerous brain tumors in The Acreage began to emerge, prompting a multi-agency investigation into the cause of the tumors. At least three adult residents of The Acreage (including Ms. Pinares) who were exposed to the contaminated groundwater have developed clear cell renal carcinomas "as a result of their ingestion, inhalation, and dermal absorption."

The Federal Housing Administration, acting in August of 2010, "imposed a warning advising appraisers that a state-declared cancer cluster may be harming home values in the central Palm Beach County community." Due to the

17

contamination caused by P&W, the plaintiffs have lost the full use and enjoyment of their properties in The Acreage.

**B**

As it had done with the previous two incarnations of the plaintiffs' complaints, P&W moved to dismiss the second amended complaints under Rule 12(b)(6). P&W argued for dismissal on a number of common grounds. First, it asserted that the plaintiffs inadequately alleged contamination, as they did not individually plead that they had either tested for or found contaminants on their property, nor did they allege that contamination levels exceeded the regulatory safe drinking water standard. Second, it maintained that the plaintiffs could not establish causation because the alleged pollution "could be a normal byproduct of water chlorination or could have come from fill used to raise Acreage properties." P&W asserted that the plaintiffs' failure to plead that any particular contaminant migrated onto their properties or to trace the contamination directly to P&W similarly evidenced their inability to establish causation. Third, it faulted the plaintiffs for "alleg[ing] different and contradictory theories of how anything was supposed to have travelled from Pratt & Whitney to The Acreage." Fourth, it reaffirmed its previously-asserted position that Florida law barred the "proximity" and "anticipated contamination" plaintiffs from recovering so-called "stigma" damages stemming from the pollution of their property.

18

Substantially tracking P&W's arguments, the district court dismissed the second amended complaints with prejudice. It first concluded that the plaintiffs could not state a claim because the plaintiffs neither asserted that they had tested for contamination nor alleged actual pollution of their individual properties. As the district court read the complaints, the plaintiffs merely "include[d] a conclusory allegation that their property was contaminated." The plaintiffs likewise fatally "failed to allege that [contamination levels] exceeded the regulatory safe drinking water standard." The district court further concluded that the complaints foundered because the plaintiffs pled causation in a conclusory manner; although they alleged that "the types of [contaminants] found at [P&W] traveled to somewhere under The Acreage . . . and that these types of [contaminants] are present in the groundwater of The Acreage Neighborhood," the plaintiffs did not establish a causal link between any particular pollutant that specifically traveled from P&W on one hand and the pollution in The Acreage on the other. In so holding, the district court took the plaintiffs to task for "alleg[ing] different and contradictory theories of how anything was supposed to have travelled from [P&W] to The Acreage." The district court finally concluded that the "proximity" and "anticipated contamination" plaintiffs could not state a claim for "stigma" damages under Florida law.

**IV**

19

The four claims asserted in the *Pinares* and *Adinolfe* second amended complaints require pleading and proof of distinct elements. *See*, *e.g.*, *Williams v. Davis*, 974 So. 2d 1052, 1056 (Fla. 2007) (negligence); *Aramark Uniform and Career Apparel, Inc. v. Easton*, 894 So. 2d 20, 23-24 (Fla. 2004) (violation of Fla. Stat. § 316.313(3)); *Great Lakes Dredging & Dock Co. v. Sea Gull Operating Corp.*, 460 So. 2d 510, 512 (Fla. 3d DCA 1984) (strict liability for an ultrahazardous activity); *Durrance v. Sanders*, 329 So. 2d 26, 29 (Fla. 1st DCA 1976) (nuisance). As noted, however, P&W opted to move to dismiss the second amended complaints on grounds common to all of the claims instead of challenging whether the plaintiffs properly pled each cause of action. The district court followed suit and addressed the sufficiency of the plaintiffs' claims globally instead of individually. Because, as an appellate tribunal, we are generally limited to reviewing arguments and issues that have been raised and decided in the district court, *see Porter v. Ogden, Newell & Welch*, 241 F.3d 1334, 1340 (11th Cir. 2001), we proceed to analyze only the grounds for dismissal which the district court found dispositive, and do not discuss whether each of the plaintiffs' claim was properly pled in all respects.

## A

As an initial matter, we summarily reject P&W's argument, *see* Br. For Appellee at 55-57, that the plaintiffs lack Article III standing because they have not

alleged actual contamination of their properties.  First, as we explain later, the great majority of the *Adinolfe* plaintiffs (over 300 of them) sufficiently alleged that their land has been contaminated.  Second, all of the plaintiffs in *Adinolfe* alleged a diminution in the value of their land stemming from P&W's contamination, and the two plaintiffs in *Pinares* additionally alleged personal injury (a type of cancer) and loss of consortium.  Economic harm and physical injury are well-established injuries-in-fact under federal standing jurisprudence.  *See generally Koziara v. City of Casselberry*, 392 F.3d 1302, 1305 (11th Cir. 2004) ("[i]njury in fact" is a particularized harm that is "physical, economic, reputational, contractual, or even aesthetic").  We therefore conclude that the plaintiffs, based on their allegations, have standing at this stage of the case.  *See, e.g., Covington v. Jefferson County,* 358 F.3d 626, 638 (9th Cir. 2004) (holding that homeowners who lived across the road from county landfill had Article III standing to sue county to ensure that landfill was operating as required by federal law, as violations of such law created various risks of harm, including groundwater contamination, and threatened homeowners' enjoyment of life and security); *Carlough v. Amchem Prods., Inc.,* 834 F.Supp. 1437, 1454 (E.D. Pa. 1993) ("exposure to a toxic substance constitutes sufficient injury in fact to give a plaintiff standing to sue in federal court").

**B**

21

The district court held that the "contamination" plaintiffs did not sufficiently allege actual contamination of their individual properties. This conclusion constituted error, as it discounted the aggregate plausibility of the plaintiffs' allegations.

In the first 229 paragraphs of the *Adinolfe* second amended complaint, each of the the 300+ "contamination" plaintiffs alleged that each of their properties "has been contaminated by P&W." Although this allegation may appear conclusory when read in isolation, the complaint provides additional factual allegations that easily push the "contamination" plaintiffs' "claims across the line from conceivable to plausible." *See Twombly*, 550 U.S. at 570.

The *Adinolfe* second amended complaint described the proximity of the P&W site to The Acreage and the Corbett Wildlife Management Area. The plaintiffs alleged that, through its industrial operations, P&W generated and released or discharged contaminants into the soil, surface water, and groundwater below and surrounding both its own property and the adjacent Corbett Wildlife Management Area. They then alleged that these contaminants migrated south to The Acreage; The Acreage and the P&W plant sit above the same aquifer, and water in the aquifer flows in a southerly direction as a result of the pull of water wells in The Acreage and other hydrologic principles.

22

The plaintiffs in *Adinolfe* further alleged that test wells drilled in The Acreage revealed the presence of three particular contaminants also found on P&W's property, and that the plaintiffs' hydrologists and toxicologists confirmed that these chemicals have spread to The Acreage and the plaintiffs' groundwater. According to media reports, metal drums marked "hazardous waste" were seen on P&W's property, and, after undertaking an investigation, the Palm Beach County Health Department designated The Acreage a cancer cluster.

P&W contests the accuracy of a number of the factual allegations that the plaintiffs have pled, but we must accept them as true at this stage of the case. *See Mills*, 511 F.3d at 1303. Taken together, the plaintiffs' allegations set forth facts that amount to substantially "more than labels and conclusions" concerning the matter of contamination. *Twombly*, 550 U.S. at 554. *See also Dartmouth Review v. Dartmouth Coll.*, 889 F.2d 13, 16 (1st Cir. 1989) (observing that, although "the line between 'facts' and 'conclusions' is often blurred," facts are typically "susceptible to objective verification" while conclusions most often amount to "'inferences from' the underlying facts"), *overruled on other grounds by Educadores Puertorriquenos en Accion v. Hernandez*, 367 F.3d 61 (1st Cir. 2004).

Along similar lines, the district court erred in ruling that each individual property owner must plead that he or she tested for contaminants on his or her property to properly allege actual contamination. Proof of such individualized

23

testing may well prove necessary for the "contamination" plaintiffs to meet their ultimate burden of persuasion, but they need not plead that such testing has occurred at the motion-to-dismiss stage. *See Twombly*, 550 U.S. at 555 (observing that "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations"). The plaintiffs alleged that they tested for and found contaminants on at least some of The Acreage properties, and the plaintiffs' hydrologists and toxicologists verified the presence of these chemicals in The Acreage and the plaintiffs' groundwater. These assertions, taken in tandem with the other allegations discussed above, are more than sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 570.

## C

The district court also concluded that the plaintiffs could not state a claim without alleging that contamination on their property "exceeds the regulatory safe drinking water standard." Under Florida law, the district court should not have imposed that requirement.

To support the proposition that only contamination above the applicable regulatory standard is actionable under Florida law, P&W relies on *The St. Joe Co. v. Leslie*, 912 So. 2d 21 (Fla. 1st DCA 2005). We acknowledge that this case contains language suggesting in passing that a plaintiff cannot maintain a contamination claim unless "the waste . . . exceeded [the Florida Department of

24

Environmental Protection]'s standards, *id.* at 25, but we do not believe this language constitutes a definitive statement of Florida law.

The First District's statement in *Leslie*, written in the context of a class certification discussion, fails to take into account the substantial body of Florida law endorsing the basic tort principle that "while one's compliance with a statute or an ordinance may amount to evidence of reasonableness, such compliance is not tantamount to reasonableness as a matter of law." *Westland Skating Ctr., Inc. v. Gus Machado Buick, Inc*., 542 So. 2d 959, 964 (Fla. 1989). *Accord Fla. Power & Light Co. v. Glazer*, 671 So. 2d 211, 214 (Fla. 3d DCA 1996) ("While compliance with a statutory standard is evidence of due care, it is not conclusive on the issue. Such a standard is no more than a minimum, and it does not necessarily preclude a finding that the actor was negligent in failing to take additional precautions") (citing PROSSER AND KEETON ON THE LAW OF TORTS § 36, at 233 (5th ed. 1984)); *Nicosia v. Otis Elevator Co.*, 548 So. 2d 854, 856 (Fla. 3d DCA 1989) ("while proof of compliance with a statute is evidence of due care, it is not conclusive on the issue") (citing RESTATEMENT (SECOND) OF TORTS § 288C (1979)). In fact, in two opinions issued well before *Leslie,* the First District stated that proof of compliance with a standard is merely non-conclusive evidence of a lack of negligence. *See Jackson v. H.L. Bunton Co.,* 630 So. 2d 1173, 1175 (Fla. 1st DCA 1994); *St. Louis-San Francisco Ry. Co. v. White,* 369 So. 2d 1007, 1011 (Fla. 1st

25

DCA 1979).    Although P&W argues that no additional precautions were reasonably necessary here, resolution of that question would be improper (and impossible) at the motion-to-dismiss stage.  In sum, while the applicable regulatory standard may be instructive for a trier of fact as evidence of what the government deems safe for the public, *see Glazer*, 671 So. 2d at 214, it does not amount to an all-purpose benchmark for determining as a matter of law how much one can reasonably contaminate another's private property, much less a threshold issue that plaintiffs must preemptively address at the pleading stage to state tort claims under Florida law.

What we have said so far applies at least to the plaintiffs' negligence and nuisance claims, both of which require a showing of unreasonable conduct. *See Beckman v. Marshall*, 85 So. 2d 552, 555 (Fla. 1956) (nuisance); *R.J. Reynolds Tobacco Co. v. Brown*, 70 So. 3d 707, 717 (Fla. 4th DCA 2011) (negligence). And we cannot discern a reason why the plaintiffs' strict liability claim would include a minimum contamination level requirement. Although some courts in other jurisdictions have held that a plaintiff cannot show cognizable injury or damages stemming from groundwater contamination unless the level of pollution exceeds the regulatory maximum contaminant level, that view is not unanimous, and

26

Florida courts have not endorsed such a rule.  We see no basis for imposing it here.[4]

As for the plaintiffs' § 376.313(3) claim, *Leslie* is the only case suggesting a minimum contamination requirement.  And the cursory statement from that case cited above is at odds with the Florida Supreme Court's recent conclusion that § 376.313 is part of "a far-reaching statutory scheme aimed at remedying, preventing, and removing the discharge of pollutants from Florida's waters and lands" and provides "private causes of action to any person who can demonstrate damages as defined under the statute." *Curd v. Mosaic Fertilizer, LLC*, 39 So. 3d 1216, 1222 (Fla. 2010).  That statute defines "damage" as "the documented extent of any destruction to or loss of any real or personal property," *id.* at 1221 (quoting Fla. Stat. § 376.031(5)), and the plaintiffs here have alleged that P&W contaminated their property, thereby causing their property values to decline.  This alleged injury fits within the broad statutory definition of "loss" or "destruction," even if the plaintiffs have not alleged contamination above the regulatory standard.

---

[4] Cases requiring that the pollution exceed the relevant regulatory level include *New Mexico v. Gen. Elec. Co.*, 335 F. Supp. 2d 1185, 1212 (D.N.M. 2004) (New Mexico law); *Iberville Parish Waterworks Dist. No. 3 v. Novartis Crop Prot., Inc.*, 45 F. Supp. 2d 934, 941-42 (S.D. Ala. 1999) (Louisiana and Ohio law); and *Brooks v. E.I. Du Pont De Nemours & Co., Inc.*, 944 F. Supp. 448, 449 (E.D.N.C. 1996) (North Carolina law).

For contrary cases suggesting that contamination below regulatory requirements may be actionable, see *Rhodes v. E.I. du Pont de Nemours and Co.*, 657 F. Supp. 2d 751, 764 (S.D.W.Va. 2009) (West Virginia law), and *In re Methyl Tertiary Butyl Ether (MTBE) Prods.*, 458 F. Supp. 2d 149, 155-57 (S.D.N.Y. 2006) (California and New York law).

27

We therefore conclude that the district court erred in ruling that failure to allege contamination above regulatory levels doomed the "contamination" plaintiffs' claims under Rule 12(b)(6).

## D

The district court also ruled that the plaintiffs had failed to sufficiently plead causation. We disagree.

First, a claim under § 376.313(3) does not require a typical showing of causation. *See Aramark,* 894 So. 2d at 23-24. Insofar as that statutory claim was concerned, therefore, causation did not have to be pled.

Second, with respect to the common-law tort claims, the allegations of the second amended complaints sufficiently set forth a plausible causal chain connecting P&W with the alleged contamination. The complaints link P&W's release of contaminants onto its own property and the adjacent Corbett Wildlife Management Area, the southward migration of these pollutants to The Acreage, the digging of test wells in The Acreage and the subsequent confirmation of the presence of contaminants in groundwater, the discovery of metal drums marked "hazardous waste," and the designation of The Acreage as a cancer cluster. In the aggregate, these assertions give rise to a "reasonable inference that [P&W] is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

28

Third, the district court mistakenly focused on the plaintiffs' choice to plead "different and contradictory theories" of causation. It is a well-settled rule of federal procedure that plaintiffs may assert alternative and contradictory theories of liability. *See Instituto De Prevision Militar v. Merrill Lynch*, 546 F.3d 1340, 1352 (11th Cir. 2008) ("The Federal Rules of Civil Procedure . . . allow plaintiffs to plead inconsistent theories"). *See also* Fed. R. Civ. P. 8(d)(2) (where "a party makes alternative statements, the pleading is sufficient if any one of them is sufficient"). In the absence of a developed factual record, or undisputed matters which can be judicially noticed, a district court is not equipped to make plausibility determinations on complex scientific issues such as the direction in which water in an aquifer flows, or whether other sources – like water chlorination – better account for the levels of contamination alleged to exist on certain property. Accepting the plaintiffs' allegations as true, it is plausible that the contaminants found on the P&W property migrated to The Acreage via a common aquifer and contaminated the plaintiffs' groundwater and land. Although other possible sources for this contamination surely exist, there is no "obvious alternative explanation" that a court, drawing on its "judicial experience and common sense," can rely on at the motion-to-dismiss stage to conclude that the plaintiffs' explanation is implausible. *See Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 682.

In this case, moreover, the theories of causation that the plaintiffs allege - "[g]roundwater movement, surface water movement, seepage, percolation pond flooding, canal flooding, and wind"—are  not necessarily mutually exclusive, as they could serve as collective factors in the migration of P&W's contaminants. Listing several possible causal factors does not amount to "conclusory 'catch all' allegations."

In sum, where necessary, the plaintiffs' allegations are sufficient to raise a "reasonable expectation" or "render plausible" that their properties are contaminated and that P&W is the cause of that contamination.  *Twombly*, 550 U.S. at 570.  The district court mistakenly concluded otherwise.

## IV

The "proximity" and "anticipated contamination" plaintiffs in *Adinolfe* alleged that, although their land was not currently contaminated, they had suffered a diminution in value because their properties were near to areas where the groundwater was contaminated or would soon be contaminated.  Pointing to the "elementary law of science . . . that groundwater is not static," these plaintiffs alleged that there was a "scientific basis to postulate that [their] properties will become contaminated," based on "a reasonable degree of hydrologic and geologic probability and certainty."

30

The district court, again ruling globally, dismissed all of the claims of the "proximity" and "anticipated contamination" plaintiffs on the ground that they did not allege actual contamination of their individual properties. Without actual contamination, the district court reasoned, these plaintiffs could not recover "stigma" damages or damages for diminution in the value of their properties. P&W defends the district court's ruling on the same rationale – that under *Leslie*, 912 So. 2d at 24-26, actual contamination is required. *See* Br. for Appellee at 42-47.  P&W also argues that other Florida cases cited by the plaintiffs do not undermine the holding in *Leslie*.

## A

Our review of Florida law yields a conclusion different from that of the district court. As we read the relevant Florida cases, the lack of actual contamination does not prevent the "proximity" and "anticipated contamination" plaintiffs from suing P&W.

In *Leslie*, which we discussed earlier as to the minimum contamination issue, the First District reversed the trial court's order granting class certification in a case in which property owners were suing a paper company (for trespass, nuisance, unjust enrichment, strict liability, negligence, and violation of § 376.313(3)) for dumping contaminants from a nearby mill.  The First District first explained that the named class representatives could not prove their own claims

because they had not testified that their own properties had been harmed by the dumping. *See id.* at 24 & n.1. It then stated that "because no proof was adduced that any of the class representatives' land was contaminated, the concept of 'stigma' damages is inapplicable." *Id.* at 24-25. Finally, it said that "[b]ecause individualized factual determinations will be necessary to determine whether a class member's property is contaminated and, if so, what caused the contamination, the trial court abused its discretion by finding that common issues predominate." *Id.* at 25-26.

If *Leslie* were the only case in Florida touching upon these matters, we might well be required to follow it. As we have said before, if the Florida Supreme Court has not spoken on an issue, we should adhere to the decisions of Florida's intermediate appellate courts "unless there is some persuasive indication" that the Florida Supreme Court "would decide the issue [differently]." *Flintkote Co. v. Dravo Corp.*, 678 F.2d 942, 945 (11th Cir. 1982). *Leslie*, however, is not the sum and substance of Florida law on the claims raised by the "proximity" and "anticipated contamination" plaintiffs.

**B**

Starting with the nuisance claim, the critical case is *Jones v. Trawick,* 75 So. 2d 785 (Fla. 1954), where the Florida Supreme Court allowed adjoining homeowners to pursue a nuisance claim to enjoin a proposed cemetery even

though their parcels of property were not going to be physically invaded or harmed

by the cemetery.  It did so with this explanation:

> [The plaintiffs] did not buy [their homes] with the expectation of living forever in the gloomy shadow of death, and with the disquieting interruptions of their normal pastimes and peaceful pursuits accasioned by constantly recurring funeral services.  We know of no one who would not object to the thought of drinking water that had been drawn from a surface so near the dead, no matter how pure the health authorities had stated it to be.

*Id.* at 788.

Significantly, *Leslie* did not cite or discuss *Jones* in ruling that a nuisance

claim requires "physical harm," and instead relied on a Fourth Circuit case

applying Virginia law for that proposition.  *See* 912 So. 2d at 24 n.1 (citing *Adams

v. Star Enterprise*, 51 F.3d 417, 423 (4th Cir. 1995)).  It is difficult for us to see

how, given the holding and rationale of *Jones*, actual contamination of a parcel of

property is a requisite for a nuisance claim under Florida law.  To the extent that

the district court dismissed the nuisance claim of the "proximity" and "anticipated

contamination" plaintiffs for failure to allege contamination of their own

properties, it therefore erred.  *See also A. & P. Food Stores, Inc. v. Kornstein*, 121

So. 2d 701, 703 (Fla. 3d DCA 1960) (concluding that excessive noise created by

air conditioning units adjacent to plaintiffs' property constituted a nuisance);

RESTATEMENT (SECOND) OF TORTS § 821D (1979) (defining a private nuisance as a

33

"*nontrespassory* invasion of "another's interest in the private use and enjoyment of land") (emphasis added).

## C

Based on the Florida Supreme Court's decision in *Curd,* we come to the same conclusion with respect to the strict liability, negligence, and § 376.313(3) claims.

In *Curd,* decided five years after *Leslie*, commercial fishermen alleged that contaminants from wastewater in a storage area had polluted Tampa Bay, the body of water from which they earned a livelihood. The fishermen, who did not claim an ownership in the damaged plant and marine life in Tampa Bay, sued the owner of the storage area, asserting negligence and strict liability claims, as well as a claim under § 376.313(3). They claimed that the contamination "resulted in damage to the reputation of the fishery products [they] were able to catch and attempt to sell," and at "least implicitly" sought "monetary damages in the nature of lost income or profits." 39 So. 3d at 1218-19.

Answering a certified question, the Florida Supreme Court ruled that under § 376.313(3) the fishermen could "recover damages for their loss of income despite the fact that [they] do not own any real or personal property damaged by the pollution." *Id.* at 1222. Among other things, it noted that "the statute does not specifically list the lack of property ownership as a defense." *Id.*

34

With respect to the common law negligence and strict liability claims, the Florida Supreme Court explained that the issue was "whether Florida recognizes a common law theory under which commercial fishermen can recover for economic losses proximately caused by the negligent release of pollutants despite the fact that [they] do not own any real or personal property damaged by the pollution." *Id.* at 1222. It answered that question in the affirmative, holding that the negligence and strict liability claims were not barred by the economic loss rule and that the claims survived a motion to dismiss. *See id.* at 1222-23. As to the negligence claim, the Florida Supreme Court explained, after surveying decisions from across the country, that the owner of the storage area "owed a duty of care to the commercial fishermen, and that the . . . fishermen have a cause of action sounding in negligence." *Id.* at 1227. This duty "arose out of the nature of [the owner's] business and the special interest of the commercial fishermen in the use of the public waters," and "the discharge of the pollutants constituted a tortious invasion that interfered with the special interest of the . . . fishermen to use those public waters to earn their livelihood. We find this breach of duty has given rise to a cause of action sounding in negligence." *Id.* at 1228 (also explaining that, "in order to be entitled to compensation for any loss of profits, the commercial fishermen must prove all of the elements of their causes of action, including damages"). The Florida Supreme Court did not further discuss the strict liability

claim, but there is nothing in the opinion to indicate that this claim was not a viable one.[5]

We recognize that *Curd* is not on all fours, but it does not need to be given that the district court's sole basis for dismissing the claims of the "proximity" and "anticipated contamination" plaintiffs was the lack of contamination in their properties. P&W did not move to dismiss the negligence claims of the "proximity" and "anticipated contamination" plaintiffs based on the lack of any duty owed to those plaintiffs. As a result, our interpretation and application of the *Curd* duty rationale in *Virgilio v. Ryland Group, Inc.,* 680 F.3d 1329, 1339-40 & n.30 (11th Cir. 2012), does not control here.

Nor did P&W move to dismiss the strict liability claim of those plaintiffs on the ground that there were insufficient allegations of an ultrahazardous activity. So we have no need to analyze Florida cases addressing what sort of activity is ultrahazardous for purposes of imposing strict liability. *See, e.g., Morgan v. W.R. Grace & Co.-Conn.,* 779 So. 2d 503, 505 (Fla. 2d DCA 2000) (rejecting argument that "reclamation of phosphate lands is an ultrahazardous activity that justifies the imposition of strict liability").

---

[5] One district court has held that, under Florida law, a plaintiff suing a nearby polluter under a strict liability theory need not allege that his or her own property has been invaded or contaminated by the pollution. *See Peters v. Amoco Oil Co.,* 57 F. Supp. 2d 1268, 1286 (M.D. Ala. 1999) (interpreting *Great Lakes Dredging,* 460 So. 2d at 512-13)).

36

What *Curd* indicates to us is that, insofar as Florida common law is concerned, a tort plaintiff seeking to recover for economic harm caused by pollution or contamination need not own property that is itself polluted or contaminated.  At the very least, *Curd* provides a very good indication that the Florida Supreme Court would so rule if it were presented with this precise question under the facts alleged in the *Adinolfe* second amended complaint.   Whether or not the "proximity" and "anticipated contamination" plaintiffs can satisfy all of the elements of their common-law and statutory claims are questions necessarily left for another day given the broad, across-the-board attacks that P&W chose to make on the second amended complaints.

## V

Despite having covered a fair amount of ground, we want to emphasize that our opinion addresses only the grounds for dismissal urged by P&W and relied upon by the district court.  Those grounds, we hold, did not warrant dismissal of the second amended complaints.  If P&W believes that the plaintiffs are unable to satisfy some or all of the elements of the four claims they have pled, it can seek judgment on the pleadings after it files its answers or move for summary judgment after discovery has closed.

**REVERSED AND REMANDED.**